NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CHERYL NOVALIS-MARINE, et al.,
*Plaintiffs/Appellees/Cross-Appellants*,

*v.*

JEFFREY B. MONASH, et al.,
*Defendants/Appellants/Cross-Appellees*.

No. 1 CA-CV 24-0714

FILED 07-09-2026

Appeal from the Superior Court in Pima County
No. C20202716
The Honorable Wayne E. Yehling, Judge

**AFFIRMED**

COUNSEL

Jones, Skelton & Hochuli P.L.C., Phoenix
By Rita J. Bustos (argued)
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

Slutes, Sakrison & Rogers P.C., Tucson
By Tom Slutes, Monika Kozan
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

McNamara Law Firm, PLLC, Tucson
By Michael F. McNamara, Claire E. McNamara
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants*

The Ammons Law Firm LLP, Houston, TX
By Robert E. Ammons
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants*

The Newsome Law Firm, PLLC, Bellaire, TX
By Raina Spielman Newsome
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants*

Gallagher & Kennedy, P.A., Phoenix
By Shannon L. Clark (argued), Erin T. Jenkins
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants*

---

## MEMORANDUM DECISION

Judge Brian Y. Furuya delivered the decision of the Court, in which Presiding Judge Angela K. Paton joined. Judge Daniel J. Kiley dissented.

---

**F U R U Y A**, Judge:

¶1            Dr. Jeffrey B. Monash ("Dr. Monash") appeals the superior court's judgment entered after a jury verdict in favor of Cheryl Novalis-Marine ("Novalis-Marine") and her two children in this wrongful death and medical malpractice case. Novalis-Marine cross-appeals the court's decision to grant a directed verdict denying punitive damages. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2            Dr. Monash performed bariatric surgery on Jeremey Marine ("Marine") on January 13, 2020. After the surgery, Marine "was in extreme pain" and "wasn't doing well." Dr. Monash discharged Marine five days later to recover at home.

¶3            On January 24th, Marine had a post-discharge visit with Dr. Monash. During that visit, Marine required a wheelchair, was "turn[ing] kind of light gray and pale[,]" and had a distended abdomen. After determining that Marine was severely dehydrated, Dr. Monash ordered Marine to go to the emergency room but did not meet Marine there. When Dr. Monash arrived the next morning, he examined Marine and ordered a CT scan, but later told Marine that the scan "was useless" because they did not do the contrast correctly. The following day, on January 26th, Dr. Monash ordered an upper gastrointestinal study and informed Marine that because the test showed no leakage, he would be discharged. At this point, though, Marine was still very weak, barely talking, and had a remarkably distended abdomen. Marine passed away the next evening from sepsis, just two weeks after his surgery.

¶4            In June 2020, Novalis-Marine, Marine's wife, brought a wrongful death and medical malpractice suit against Dr. Monash[1], alleging his negligence during Marine's care caused Marine's death. After more than

---

[1]       Novalis-Marine also named Tucson Medical Center ("TMC") as a defendant, but TMC settled and is not a party to this appeal.

three years of pre-trial proceedings, a twelve-day jury trial was held in early 2024. Near the end of trial, Dr. Monash moved for a mistrial and filed a motion pursuant to Arizona Rule of Civil Procedure ("Rule") 50 for directed verdict denying Novalis-Marine's claim for punitive damages. The court denied the motion for a mistrial but granted the directed verdict. The jury ultimately found in favor of Novalis-Marine and awarded her $2.5 million and her children $500,000. Dr. Monash subsequently moved for a new trial, which the court denied.

**¶5**        Dr. Monash timely appealed and Novalis-Marine timely cross-appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Section 12-2101(A)(1).

## DISCUSSION

**¶6**        Dr. Monash argues the court erred by (1) admitting evidence of his general impairment due to chronic substance abuse and sleep deprivation, (2) admitting evidence of his treatment of previous patients and their mortality rates, (3) allowing duplicative and cumulative expert testimony, (4) providing two improper jury instructions, and (5) denying him a fair trial through cumulative errors. Novalis-Marine cross-appeals and argues the court erred by granting a directed verdict denying punitive damages.

**¶7**        We note that in her notice of cross-appeal, Novalis-Marine raised a second issue on the constitutionality of A.R.S. Section 12-352. Because this issue was not argued in the cross-appeal opening brief, it is waived and we do not address it further. *State v. Carver*, 160 Ariz. 167, 175 (1989) ("Failure to argue a claim usually constitutes abandonment and waiver of that claim.").

## I.    The Court Did Not Err in Admitting General Impairment Evidence.

**¶8**        We review both evidentiary rulings and denial of a mistrial for abuse of discretion and "will not reverse unless unfair prejudice resulted or the court incorrectly applied the law." *Larsen v. Decker*, 196 Ariz. 239, 241 ¶ 6 (App. 2000) (citation modified); *see also Cervantes v. Rijlaarsdam*, 190 Ariz. 396, 398 (App. 1997). "We view the facts and the reasonable inferences therefrom in the light most favorable to upholding the jury's verdict[]." *Valdez v. Delgado*, 254 Ariz. 495, 497 ¶ 3 (App. 2019). We also accept the court's factual findings unless clearly erroneous, *In re Isler*, 233 Ariz. 534, 537 ¶ 3 (2014), and "[w]e do not reweigh evidence or determine the

credibility of witnesses[,]" *Clark v. Kreamer*, 243 Ariz. 272, 276 ¶ 14 (App. 2017) (citation modified).

**¶9**        A defendant's general impairment "does not create in and of itself a separate issue or claim of negligence." *Ornelas v. Fry*, 151 Ariz. 324, 328 (App. 1986). Evidence of general impairment is admissible only after the plaintiff "lay[s] a reasonable foundation establishing . . . relevancy." *Id.* at 329. A plaintiff establishes relevancy by providing a factual basis that shows a defendant was impaired at the time of the negligent conduct, *id.* at 328, or "sufficiently close in time to the incident to permit an inference of [impairment,]" *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398 (App. 1990). Requiring a factual basis "ensure[s] that the proffered evidence be both relevant and probative to the issues in the case, without creating unfair prejudice." *Ornelas*, 151 Ariz. at 329. After the plaintiff establishes the defendant was impaired at the time of negligence, the plaintiff must also show that the impairment "translate[d] into conduct falling below the applicable standard of care[.]" *Id.* at 328.

**¶10**        Thus, we discern a two-prong test for admitting and using general impairment evidence: the plaintiff must establish (1) the doctor was impaired at the time of the alleged negligence; and (2) the impairment affected the doctor's ability to meet the standard of care.

**¶11**        Dr. Monash argues the court abused its discretion by admitting evidence of general impairment without a sufficient factual basis. Specifically, Dr. Monash challenges the admission of testimony from his ex-wife, Dr. Bushman, Dr. Grandner, and Dr. Joubert, each of whom discussed Dr. Monash's substance abuse or sleep deprivation. He further argues that the court committed legal error by not following *Ornelas*, in that the court did not grant a mistrial when at trial Novalis-Marine failed to establish a link between the general impairment evidence and Dr. Monash's negligence.

**¶12**        Although Dr. Monash contends otherwise, the court did indeed apply *Ornelas* by requiring, and ultimately finding, a factual basis for the general impairment evidence. Thus, we consider only whether the factual basis found by the court was clearly erroneous. *See Valdez*, 254 Ariz. at 499 ¶ 14 (noting we will not disturb a fact determination unless it is clearly erroneous).

**¶13**        As to the first prong—i.e., the doctor was impaired at the time of the negligent conduct—the court received evidence supporting its inference that Dr. Monash was impaired during his two-week post-op treatment of Marine. Dr. Bushman testified about the effects of chronic

marijuana use and how Dr. Monash's conduct raised an inference of impairment before, during, and after Marine's treatment. Dr. Grandner provided similar testimony on chronic sleep deprivation and how it is highly likely that Dr. Monash was impaired during Marine's care. Other portions of the record further support the court's inference. The evidence indicated Dr. Monash had been using marijuana several times a day starting in 2017. The evidence further shows that Dr. Joubert diagnosed Dr. Monash with severe cannabis use disorder in 2019, which he failed to treat. The evidence also shows Dr. Monash was reported to TMC for smelling like marijuana only a couple months after Marine's death. This evidence reasonably supports the court's inference that Dr. Monash was impaired while treating Marine, and thus the court did not err in finding this factual predicate required by *Ornelas* was satisfied.

¶14          As to the second prong—i.e., the impairment affected the doctor's ability to meet the standard of care—the court found that "Drs. Grandner and Bushman laid a reasonable foundation regarding the connection between [Dr.] Monash's impairment and his ability to make competent medical decisions regarding Jeremy [*sic.*] Marine's care." At trial, Dr. Grandner testified that when someone is sleep deprived, "[t]hey could be looking like they are holding things together, but you see this accumulation of errors, mistakes, errors in judgment, [and] emotional dysregulation[.]" Dr. Bushman provided similar testimony and stated the records he reviewed showed "problems with problem solving, fatigue, concentration, [and] communication," which were "expected consequences" of Dr. Monash's impairment. These expert testimonies provided the link between Dr. Monash's impairment and his ability to make competent decisions, supporting the court's factual finding.

¶15          "A factual finding is clearly erroneous only when, considering the totality of the evidence, the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.'" *Valdez,* 254 Ariz. at 499 ¶ 14 (quoting *State v. Burr*, 126 Ariz. 338, 339 (1980)). Here, the expert testimonies, in conjunction with the evidence from before and after Marine's care, *see Mulhern*, 165 Ariz. at 398, reasonably support the court's inference that Dr. Monash was impaired while treating Marine, thus establishing the relevancy of the general impairment evidence and its link with Dr. Monash's negligence. Given this record, we cannot say the court's finding of the requisite factual basis was clearly erroneous. *Valdez*, 254 Ariz. at 499 ¶ 14.

¶16          Dr. Monash also argues the court erred because the general impairment evidence was both irrelevant and prejudicial. Because the purpose of requiring a factual basis is to prevent irrelevant and prejudicial

impairment evidence, *Ornelas*, 151 Ariz. at 329, affirming the court's factual basis also indicates the evidence is neither irrelevant nor unduly prejudicial. Thus, we conclude that the court did not abuse its discretion by admitting general impairment evidence or denying Dr. Monash's motion for a mistrial.

## II. The Court Did Not Err by Admitting Evidence of Dr. Monash's Previous Patients and Mortality Rates.

**¶17** Dr. Monash argues the court erred by admitting evidence of his previous patients' deaths and his mortality rates because such evidence was impermissible character evidence under Arizona Rule of Evidence ("ARE") 404(b).

**¶18** We review the court's evidentiary ruling for a "clear abuse of discretion[.]" *Larsen*, 196 Ariz. at 241 ¶ 6 (citation modified). A court abuses its discretion if "there is no evidence to support its conclusion or the reasons given by the court are clearly untenable, legally incorrect, or amount to a denial of justice." *Searchtoppers.com, L.L.C. v. TrustCash LLC*, 231 Ariz. 236, 241 ¶ 20 (App. 2012) (citation modified).

**¶19** ARE 404(b)(1) generally prohibits "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Our supreme court adopted a four-part test for analyzing admissibility under this rule, and such evidence is admissible if: "(1) the evidence is related to a material fact, (2) the evidence tends to make the existence of a material fact more or less probable than without the evidence, (3) the material fact that is more or less probable is something other than a party's character and the person's propensity to act in accordance with that character, and (4) the probative value of the evidence substantially outweighs the danger of unfair prejudice." *Lee v. Hodge*, 180 Ariz. 97, 100 (1994).[2]

**¶20** For the third element, ARE 404(b)(2) lists several permissible non-character purposes, including absence of mistake or accident. "The . . . absence of mistake exception to the general rule is predicated primarily on a theory of increased probability arising from repetitive actions." *Id.* at 101.

---

[2] Both parties rely on *Purcell v. Zimbelman*, 18 Ariz. App. 75 (1972), in addressing this evidentiary issue. But *Purcell* was decided before ARE 404(b) was enacted. Because *Lee v. Hodge* is a supreme court case that addresses the admissibility of similar evidence under ARE 404(b), we rely on *Lee* instead of *Purcell*.

To fall under this exception, evidence "must be similar to the alleged acts." *Id.*

¶21　　　　Here, the court found that the evidence in question did not violate ARE 404(b)(1) because it "was relevant for reasons other than to show bad character[.]" Dr. Monash argues the evidence was irrelevant because Novalis-Marine failed to show substantial similarity to Marine's case. He also asserts the absence of mistake exception does not apply and the evidence was highly prejudicial. We disagree with Dr. Monash.

¶22　　　　At trial, Dr. Awad testified about twelve of Dr. Monash's deceased patients, describing in detail the type of surgery each patient had, the mortality rate for that type of surgery, and any post-surgical complications that arose. He concluded that six of the twelve patients had the same surgery as Marine, two had different, but similar bariatric surgeries, and all twelve surgeries had a similar or lower mortality rate compared to Marine's surgery. Additionally, eleven of the twelve patients had post-surgical complications and every patient developed sepsis.

¶23　　　　Dr. Freeman presented a statistical analysis of Dr. Monash's mortality rates, highlighting the significance of Dr. Monash's high number of patient deaths to show that it was not likely accidental or due to chance.

¶24　　　　Dr. Awad's testimony established context and relevancy for Dr. Freeman's statistical analysis by explaining the similarities between previous patient cases and Marine's case, all of which contributed to Dr. Monash's high mortality rate. The analysis was relevant because it related to the material fact of whether Dr. Monash was aware of, or should have been aware of, an issue within his practice, which then directly related to Dr. Monash's breach of the standard of care and to Novalis-Marine's punitive damages claim. Thus, these two witnesses' testimonies were relevant and satisfy the first two elements of the *Lee* test.

¶25　　　　The testimonies also fall under the absence of mistake exception, satisfying the third *Lee* element. Dr. Monash argues that the previous cases must utilize "the same procedure and treatment decisions" as Marine's case to be sufficiently similar for admissibility purposes. But in *Lee*, our supreme court concluded certain prior acts were similar enough to the case before it because the prior acts "involved the same 'gross features'—that is, all [the prior acts] were committed by the 'same doer' and all involve the same type of act, although not necessarily the same method of acting." *Id.* at 101. Here too, Dr. Monash was the "same doer" in each case about which Dr. Awad testified, and each case involved the same type of act, which was treating patients in a way that led to sepsis and then

continued treatment in the presence of sepsis. Although not all twelve patient cases involved the same type of surgery as Marine's case, "the same method of acting" is not required to find the applicable level of similarity. *Id.* Thus, because the previous patient cases are sufficiently similar to Marine's case, just as in *Lee*, such evidence, in combination with the statistical analysis, helps prove that Marine's death was not the result of a mistake. *Id.* ("[T]he laws of probability suggest that the repetition of these 'bad acts' diminishes the likelihood that the alleged act was accidental."). Thus, the third element of the *Lee* test is also satisfied.

¶26 The dissent concludes that the absence of mistake exception does not apply because Novalis-Marine did not allege that Dr. Monash intentionally harmed Marine. *Infra.* ¶¶ 65–66. But negligence is generally unintentional. Negligence can derive from an innocent mistake or be the unintended consequence of other choices. So, while Novalis-Marine did not allege intentionality, her theory was that Marine's death was the consequence of Dr. Monash's continuing to treat patients while laboring under chronic sleep deprivation and an untreated cannabis use disorder, under which he used marijuana several times a day. The previous patient cases show Dr. Monash's history of treating patients in a way that led to sepsis. In the face of such history, it is less probable that Dr. Monash's treatment in Marine's case was the product of an innocent mistake. *See Lee*, 180 Ariz. at 101. Thus, we conclude the absence of mistake exception applies.

¶27 The dissent also asserts that under the second prong of *Purcell v. Zimbelman*, 18 Ariz. App. 75 (1972), evidence of the previous patients was inadmissible because the court did not find that Dr. Monash was negligent in treating those patients. *Infra.* ¶¶ 60–61. But predicating admission of evidence on a court's finding that a doctor was negligent in prior instances could lead the jury to conclude that the doctor's prior negligence means he is also negligent in the current case. This directly contradicts ARE 404(b)(1), so we decline to apply this test. *See De Camp v. Central Ariz. Light & Power Co.*, 47 Ariz. 517, 522 (1936) (noting rules of practice "have the same force and effect as statutes so far as they are applicable to any case"); *see also Duff v. Lee*, 250 Ariz. 135, 138 ¶ 14 (2020) (noting "we seek to harmonize rules and statutes, reading them in tandem whenever possible").

¶28 Finally, we find no abuse of discretion in the court's determination that the prior acts and the mortality rates were more probative than prejudicial. The court held that "considering the relevance of the evidence and the weight of other evidence establishing Defendant Monash's negligence . . . any prejudice in admitting the evidence did not substantially outweigh the probative value of the evidence." The standard

of review for determinations of prejudice is highly deferential, *Yauch v. S. Pac. Transp. Co.*, 198 Ariz. 394, 403 (App. 2000) ("[T]he balancing of factors under [ARE] 403 is peculiarly a function of trial courts, not appellate courts."), and we will not disturb the court's ruling unless "no reasonable judge would have reached the same result under the circumstances." *State v. Armstrong*, 208 Ariz. 345, 354 ¶ 40 (2004) (citation omitted).

**¶29** As noted, the evidence directly concerned the central issues of breach and punitive damages, and therefore, was highly probative. Doubtless, the evidence was harmful to Dr. Monash's defense. But "not all harmful evidence is unfairly prejudicial because evidence which is relevant and material will generally be adverse to the opponent." *State v. Strong*, 258 Ariz. 184, 211 ¶ 115 (2024) (citation modified). While we are concerned that some details in Dr. Awad's testimony were unnecessary, such that we might have decided this issue differently in the first instance, we must defer to the court's ruling because, based on the record, we cannot say that no reasonable judge would have come to the same decision as the judge did in this case. *See Armstrong*, 208 Ariz. at 354 ¶ 40. Thus, we affirm the court's decision to admit evidence of Dr. Monash's previous patients and mortality rates.

## III. The Court Did Not Admit Duplicative and Cumulative Testimony.

**¶30** Dr. Monash argues the court erred by allowing duplicative and cumulative expert testimony about the standard of care and cause of death, in violation of Rule 26(b)(4)(D). We note that the rule Dr. Monash cited, also known as the "One-Expert Rule," was revised as Rule 26(b)(4)(F)(i) in 2018. *McDaniel v. Payson Healthcare Mgmt., Inc.*, 253 Ariz. 250, 255 ¶¶ 17–19 (2022). As such, we will refer to the current rule.

**¶31** The One-Expert Rule establishes the presumption that each party is "entitled to call only one retained or specially employed expert to testify on an issue." Ariz. R. Civ. P. 26(b)(4)(F)(i). This limit may be extended if the parties agree or the court orders otherwise. *Id.* Additionally, our supreme court has recognized that "where an issue cuts across several professional disciplines, the court should be liberal in allowing expansion of the limitation upon experts established in [Rule 26(b)(4)(F)(i)]." *McDaniel*, 253 Ariz. at 257 ¶ 25 (citing a 1991 comment to Rule 26(b)(4)).

**¶32** We review admission of expert testimony for abuse of discretion, *Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, 356 ¶ 11 (App. 2014), but "[i]f an evidentiary ruling is predicated on a question of law . . . we review that ruling *de novo*[,]" *In re Conservatorship for Hardt*, 242 Ariz. 449, 452 ¶ 9 (App. 2017) (noting that even when reviewing for abuse

of discretion, "a court abuses its discretion if it commits an error of law in reaching a discretionary conclusion."). The issue of whether expert testimony violates the One-Expert Rule is a question of law that we will review de novo. *Stafford v. Burns*, 241 Ariz. 474, 481 ¶ 25 (App. 2017).

### A. The Court Did Not Admit Duplicative or Cumulative Testimony About the Standard of Care.

**¶33** Dr. Monash argues he should receive a new trial because the court allowed multiple experts to testify about the standard of care, in addition to Novalis-Marine's disclosed expert. He also argues two of the experts were not qualified under A.R.S. Section 12-2604 to testify about the standard of care. Because we conclude that none of the experts offered standard of care testimony, we do not address Dr. Monash's qualification argument.

**¶34** Dr. Monash first applies this challenge to Dr. Freeman's testimony. But Dr. Freeman presented a statistical analysis of mortality rates for bariatric patients and explained that Dr. Monash's rate was 6.25 times higher than the national rate. In his brief, Dr. Monash points to Dr. Freeman's testimony that "[the higher mortality rate] comes down to something about Dr. Monash, so whether it's his training or anything else." But this testimony does not address the standard of care in Marine's case. Rather, in context, it notes that because there is no evidence of patient problems contributing to Dr. Monash's high mortality rate, the rate must be explained by some factor related to Dr. Monash, such as training, impairment, or technique. Considering such factors is necessary for Dr. Freeman's statistical analysis, so his testimony was within the scope of his expertise. Thus, we conclude he did not offer duplicative or cumulative standard of care testimony.

**¶35** Dr. Monash next challenges Dr. Awad's testimony, arguing he improperly testified about an error during Marine's surgery and about his impressions of a post-surgical CT scan. But Dr. Awad was retained to compare the circumstances of Dr. Monash's previous patients' deaths with Marine's case, which included comparing any complications that arose across those cases. As such, Dr. Awad did not comment on the standard of care in Marine's case, but rather testified within the scope of his expertise about complications that arose during Marine's surgery or appeared in the CT scan and their similarity to other patients who experienced harmful outcomes under Dr. Monash's care.

**¶36** Dr. Monash further argues that Dr. Awad improperly testified about Dr. Monash's quality of care during an appendicitis case, in

response to a juror's question. However, not only did Dr. Monash fail to object to the question or to Dr. Awad's answer at trial, but this testimony also did not address the applicable standard of care in Marine's case. Thus, Dr. Awad's testimony was not duplicative or cumulative standard of care testimony.

¶37 Finally, Dr. Monash challenges Dr. Bushman's testimony by arguing Dr. Bushman improperly testified that Dr. Monash made "errors . . . in [his] medical decision making." But, in context, Dr. Bushman's testimony did not opine as to the standard of care in Marine's case. Instead, Dr. Bushman highlighted how impairment from chronic substance abuse generally affected Dr. Monash at work. He further supported Dr. Freeman's statistical analysis conclusion that Dr. Monash's high mortality rate was likely caused by a factor related to Dr. Monash. Thus, Dr. Bushman did not testify about the standard of care in Marine's case, and his testimony was not duplicative or cumulative standard of care testimony.

### B. The Court Did Not Admit Duplicative or Cumulative Testimony About Marine's Cause of Death.

¶38 Dr. Monash contends the court erred by allowing Dr. Shikora to testify about Marine's cause of death, in addition to Novalis-Marine's disclosed expert. Dr. Shikora was called to testify about the standard of care required in Marine's case and whether Dr. Monash met that standard. But to make a proper conclusion, Dr. Shikora had to review Marine's cause of death—complication from the surgery—to conclude if it was because of Dr. Monash's care. Thus, Dr. Shikora did not discuss the cause of death to prove Dr. Monash's negligence, but rather to support his conclusion that Dr. Monash fell below the standard of care while treating Marine. Therefore, Dr. Shikora's testimony was not duplicative or cumulative cause of death testimony.

¶39 Dr. Monash also challenges Dr. Awad's testimony. As previously discussed, the purpose of Dr. Awad's testimony was to compare Marine's death with previous patients' deaths. *Supra* ¶ 35. To make an accurate comparison, it was necessary for Dr. Awad to discuss the cause of Marine's death. Thus, Dr. Awad properly testified within the scope of his expertise and his testimony was not duplicative or cumulative cause of death testimony.

¶40 In sum, Novalis-Marine presented testimony from multiple experts to develop her theory regarding Marine's cause of death, the standard of care applicable to Dr. Monash's treatment of Marine, Dr.

Monash's breach of that standard, the causal link between Dr. Monash's care and Marine's cause of death, and to refute Dr. Monash's defenses. The testimony covered complex professional matters that did result in some overlap, at least some of which was elicited by Dr. Monash's own cross-examination. But on balance, the multiple experts appear reasonably necessary to establish Novalis-Marine's case, and the court actively controlled the progress of testimony to limit that overlap. On our review of this record, even assuming the court could have done more to reduce overlapping expert testimony, such would not entitle Dr. Monash to any relief. *See Lane v. Ctr. for Orthopedic & Rsch. Excellence Inc.*, 1 CA-CV 20-0177, 2021 WL 734737, at *5 ¶ 18 (Ariz. App. Feb. 25, 2021) (mem. decision) ("[E]rroneous admission of cumulative evidence generally does not require reversal."). We discern no abuse of discretion as to this issue.

## IV. Dr. Monash Failed to Identify Prejudice Resulting from the Jury Instructions.

**¶41** Dr. Monash argues the court erred by giving a "Pre-existing Condition, Unusually Susceptible Plaintiff" instruction and a "Magnitude of the Apparent Risk" instruction. We review the court's decision to give a jury instruction for abuse of discretion. *State v. Turner*, 251 Ariz. 217, 223 ¶ 22 (App. 2021). "We review jury instructions as a whole to determine whether the jury was properly guided in its deliberations." *Powers v. Taser Intern., Inc.*, 217 Ariz. 398, 400 ¶ 12 (App. 2007). We will not reverse on the ground of improper jury instructions unless "the instruction was both erroneous and prejudicial to the substantial rights of the appealing party." *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 504 (1996) (citation modified). Prejudice "will not be presumed, but must affirmatively appear from the record." *Id.* Because Dr. Monash failed to identify any prejudice, we do not address whether the instructions are erroneous. *See id.*

**¶42** Dr. Monash's sole argument to establish prejudice is that under *Gilmore v. Wingate*, 21 Ariz. 542, 547 (1920), the "Pre-Existing Condition" instruction is presumptively prejudicial because it "enunciates an improper measure of damages[.]" But *Gilmore* is inconsistent with modern case law. Our supreme court has expressed that prejudice "must affirmatively appear from the record[,]" and thus we will not presume its existence. *Gemstar Ltd.*, 185 Ariz. at 504. Dr. Monash did not identify any prejudice in the record that resulted from either the "Pre-Existing Condition" instruction or the "Magnitude of the Apparent Risk" instruction. Because Dr. Monash did not identify any prejudice, we affirm the court's jury instructions.

**V.    The Cumulative Effect Doctrine Does Not Warrant a New Trial.**

**¶43**        Dr. Monash argues he is entitled to a new trial based on the cumulative effect of the superior court's errors. Because we find no error, we reject Dr. Monash's argument that they amounted to cumulative error warranting a new trial.

**VI.    The Court Did Not Err in Granting a Directed Verdict Denying Punitive Damages.**

**¶44**        In her cross-appeal, Novalis-Marine contends the court erred by granting Dr. Monash's motion for a directed verdict denying punitive damages. Dr. Monash argues Novalis-Marine waived this argument because she did not file a motion for a new trial, as required by A.R.S. Section 12-2102(C).

**¶45**        We have recently held that a "mid-trial motion under Rule 50(a) alone will not preserve our jurisdiction unless followed by a post-verdict Rule 50(b) motion." *Williams v. King*, 248 Ariz. 311, 317 ¶ 31 (App. 2020), *as amended* (Jan. 29, 2020) (citation modified). Indeed, the express language commands that appellate courts "shall not consider the sufficiency of the evidence to sustain the verdict or judgment in an action tried before a jury unless a motion for a new trial was made." A.R.S. § 12-2102(C). Further, "[a] civil appeal is a statutory privilege rather than a right and strict compliance with statutory and rule requirements is mandatory." *Wendling v. Sw. Sav. & Loan Ass'n*, 143 Ariz. 599, 601 (App. 1984). Because Novalis-Marine's punitive damages claim was resolved by a contested mid-trial motion for directed verdict under Rule 50(a), but she failed to move post-verdict for a new trial under Rule 50(b), the express language of A.R.S. Section 12-2102(C) would seem to preclude our review of the directed verdict. *See Williams*, 248 Ariz. at 317 ¶ 31. However, Novalis-Marine argues that this requirement would be futile and conflicts with our supreme court's opinion in *McClinton v. Rice*, 76 Ariz. 358 (1953).

**¶46**        In *McClinton*, a plaintiff pursued a claim "involving slander and malicious prosecution" and sought punitive damages. *Id.* at 360. That claim was resolved on the defendant's motion for directed verdict. *Id.* After the jury returned a verdict on other claims, the plaintiff did not file a motion for a new trial but instead appealed the directed verdict. *Id.* The defendant argued that the supreme court was without jurisdiction to review the directed verdict because the plaintiff did not move for a new trial, citing Section 21-1703 of the Arizona Code 1939—the like-worded predecessor statute to A.R.S. Section 12-2102. *Id.* at 361.

¶47 In reviewing this argument, the court noted that the defendant's "motion for a directed verdict was opposed and argued," *id.* at 361, and the "sufficiency of the evidence was pointedly before the lower court," *id.* at 362. It opined that:

> [t]he purpose of a motion is to obtain a ruling or an order directing that some act be done in favor of the applicant, and the essentials of a motion are that the attention of the court must be called to the particular matter or request, and that the court be given an opportunity to rule as to the matter.

*Id.* Under those circumstances, the supreme court reasoned that "to require a further motion for a new trial to be made . . . would be to require a hollow procedure opposed to the reasons and purposes for which section 21–1703 exists[.]" *Id.* Thus, on these facts, the court held that the plaintiff's failure to file a motion for new trial did not deprive it of jurisdiction to review the sufficiency of the evidence. *Id.*

¶48 Here, after presentation of Novalis-Marine's case-in-chief, Dr. Monash moved for a directed verdict as to her punitive damages claim. As in *McClinton*, this motion was contested and argued. And after the jury resolved the remaining claims, Novalis-Marine did not file a motion for a new trial before appealing the judgment as a matter of law entered against her. But like in *McClinton*, the sufficiency of the evidence as to that issue was certainly raised to the attention of the superior court. Thus, we agree that the relevant circumstances of this case parallel those present in *McClinton*.

¶49 The categorical rule presented in *Williams* diverges from the exception established in *McClinton*. *Compare Williams*, 248 Ariz. at 317 ¶ 31 *with McClinton*, 76 Ariz. at 362. But the defendants in *Williams* "offer[ed] no authority for a futility exception," thereby failing to bring *McClinton*'s reasoning to our attention. *Williams*, 248 Ariz. at 317 ¶ 31. And notwithstanding *McClinton*'s apparent inconsistency with the express language of A.R.S. Section 12-2102(C), nevertheless, "[w]e are bound by decisions of the Arizona Supreme Court and have no authority to overrule, modify, or disregard them." *State v. Rodriguez*, 260 Ariz. 36, 57 ¶ 62 (App. 2025). Therefore, we conclude that we have jurisdiction to review the sufficiency of the evidence regarding Novalis-Marine's punitive damages claim. *See McClinton*, 76 Ariz. at 362. Even so, Novalis-Marine's cross-appeal is unavailing on its merits.

¶50 We review the court's decision to grant a directed verdict de novo. *Newman v. Select Specialty Hospital-Arizona, Inc.*, 239 Ariz. 558, 562 ¶ 9

(App. 2016). "When considering whether the issue of punitive damages was properly withdrawn from the jury, we must construe the evidence and all reasonable inferences that may be drawn from the evidence in a light most favorable to [the] party seeking such damages." *Id.* at 562 ¶ 10 (citation modified). The court must deny a motion for directed verdict on punitive damages "if a reasonable jury could find the requisite evil mind by clear and convincing evidence." *Thompson v. Better-Bilt Aluminum Prods. Co., Inc.*, 171 Ariz. 550, 558 (1992).

¶51 Plaintiffs in negligence cases are entitled to punitive damages if they can show that the defendant acted with an "evil mind." *Swift Transp. Co. of Ariz. L.L.C. v. Carman*, 253 Ariz. 499, 506 ¶ 22 (2022). This burden is quite high. To prove an "evil mind," the plaintiff must show by clear and convincing evidence "that the defendant's conduct was outrageous, oppressive or intolerable, and created a substantial risk of tremendous harm, thereby evidencing a conscious and deliberate disregard of the interests and rights of others." *Id.* at 506 ¶ 24 (citation modified). The evidence must also show that the defendant had more than a "reason to appreciate the severity of the risk; the defendant must have *actually* appreciated the severity of the risk before *consciously* disregarding it." *Id.* at 507 ¶ 25.

¶52 There is no evidence in the record establishing that Dr. Monash actually appreciated, and then consciously disregarded, the risk of treating Marine while impaired. Despite the evidence of his impairment, Dr. Monash never acknowledged that he had a problem with marijuana use or sleep deprivation. To the contrary, he consistently denied any problems, stated multiple times that he has never treated a patient while impaired, and never received any recommended treatment.

¶53 Because Dr. Monash himself did not believe he was impaired at any point while treating Marine, no reasonable jury could conclude that Dr. Monash "*actually* appreciated the severity of the risk" of treating Marine while impaired "before *consciously* disregarding it." *Id.* And because no reasonable juror could find that the standard for punitive damages could be established by clear and convincing evidence, we affirm the court's decision to grant the directed verdict denying punitive damages.

## CONCLUSION

¶54 We affirm the court's judgment entered pursuant to a jury verdict and its decision to grant the directed verdict on punitive damages.

**K I L E Y, J.**, dissenting:

¶55        Dr. Jeffrey Monash performed a Roux-en-Y gastric bypass procedure on Jeremey Marine in January 2020. Over the next two weeks, Marine's physical condition steadily deteriorated until he died. In the subsequent suit she brought against Monash, Marine's widow, Cheryl Novalis-Marine, alleged no negligence in the performance of her husband's Roux-en-Y procedure, claiming instead that her husband died as a result of Monash's negligent post-operative care.

¶56        The record shows that Monash performed over 2,000 surgical procedures of various types on other patients in the six-year period preceding Marine's death. At trial, Novalis-Marine was allowed to present evidence of twelve of these procedures, all of which had negative outcomes. The trial court held that this evidence was admissible under *Purcell v. Zimbelman*, 18 Ariz. App. 75 (1972). The Majority affirms on other grounds, holding that the evidence was admissible under Arizona Rule of Evidence ("Rule") 404(b).[3] Because, in my view, evidence of these other procedures was not admissible on any grounds and, further, that it was unfairly prejudicial, I would vacate the judgment and remand for a new trial. I respectfully dissent.

¶57        At trial, Novalis-Marine was allowed to present evidence that, four years before he performed Marine's gastric bypass operation, Monash performed "a repair of a recurrent inguinal hernia" on G.M., who experienced "bleeding" that "was not detected during the surgery," resulting in G.M.'s death the following day. Novalis-Marine also presented evidence that Monash performed "an elective ventral hernia repair" on S.P. in 2017, and that a "surgical complication" resulted in S.P.'s death three months later.

---

[3] Rule 404(b) provides, with certain exceptions not relevant here, that

> evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith[,] . . . [but] may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ariz. R. Evid. 404(b).

¶**58**        Similarly, Novalis-Marine presented evidence that when Monash attempted to perform an appendectomy on J.W. in 2019, the tissue he removed from the patient's abdomen was later determined to be "adipose tissue" rather than the appendix. Because Monash mistakenly removed fatty tissue instead of J.W.'s appendix, the patient "continued" to experience "progressive appendicitis" until his appendix was removed by a different surgeon.

¶**59**        The nine other surgeries that Monash performed were all bariatric procedures of one type or another. Novalis-Marine presented no evidence, however, that Monash performed any of them negligently. On the contrary, in successfully arguing for the admission of this evidence, Novalis-Marine's counsel told the trial judge that Novalis-Marine would present no evidence or argument "that Dr. Monash was negligent" in performing these other procedures, or that any of the negative outcomes "was Dr. Monash's fault[.]" Indeed, counsel expressly conceded that "complications occur in the absence of negligence."

¶**60**        Novalis-Marine argued, and the trial court agreed, that evidence of the unsuccessful procedures that Monash performed on twelve other patients was admissible under *Purcell*. In *Purcell*, the plaintiff, who suffered from diverticulitis, sued the surgeon and the hospital after undergoing an inappropriate medical procedure known as a "pull-through operation" on the diseased portion of his bowel. 18 Ariz. App. at 79. At trial, the plaintiff presented expert testimony that the surgeon fell below the standard of care by performing the pull-through operation instead of another, more appropriate procedure. *Id.* at 80. The plaintiff also presented evidence that the surgeon had previously been sued by four other diverticulitis patients – Blickley, Hill, Kelly, and Wolford – after performing "substantially similar" procedures on them, and that the Blickley and Hill lawsuits were resolved adversely to the surgeon. *Id.* at 80, 83, 85. On appeal, this Court affirmed, holding that evidence that Blickley and Hill successfully sued the surgeon was properly admitted "since it tended to show [the surgeon's] inability to properly treat diverticulitis and his misconception of the proper surgical treatment[.]" *Id.* at 85. The *Purcell* court further held that the trial court correctly "[t]old the jurors they were not to consider the Kelly and Wolford cases in connection with the claim against" the surgeon, evidently because those cases had not yet been resolved. *Id.*

**¶61** *Purcell* does not support Novalis-Marine's position here.[4] In upholding the admission of evidence of treatment the surgeon provided to other patients, the *Purcell* court emphasized that those procedures were "substantially similar" to the one the surgeon performed on the plaintiff. 18 Ariz. App. at 83. Moreover, in holding that the jurors were properly allowed to consider the procedures performed on Blickley and Hill as evidence of the surgeon's negligence, the *Purcell* court indicated that those procedures were relevant to show the surgeon's negligence because the ensuing lawsuits were resolved adversely to the surgeon. The *Purcell* court expressly held that the Kelly and Wolford lawsuits, which were not yet resolved, could not be considered to show the surgeon's negligence. *Purcell* thus stands for the proposition that evidence of prior procedures performed by the defendant doctor in a malpractice case may properly be considered by the jurors only if (1) the prior procedures are "substantially similar" to the one performed on the plaintiff and (2) the plaintiff presents evidence from which the jurors could conclude that the prior procedures were performed negligently.

**¶62** Here, the hernia and appendectomy procedures that Monash performed on G.M., S.P., and J.W. were not remotely similar to the Roux-en-Y procedure he performed on Marine. Evidence of those surgeries was thus plainly inadmissible under the first prong of the *Purcell* test. And because the superior court made no finding that Monash was negligent in his treatment of the other nine patients (and, indeed, Novalis-Marine

---

[4] I find *Purcell*'s holding difficult to square with Rule 404(b)'s prohibition on the admission of prior acts "to show action in conformity therewith." Ariz. R. Evid. 404(b); *see also Bair v. Callahan*, 775 F.Supp.2d 1163, 1170–71 (D.S.D. 2011) (rejecting plaintiff's claim, in medical malpractice case, that Federal Rule 404 authorized admission of evidence that defendant doctor had "previously misplaced pedicle screws" when performing procedures on other patients; "[Federal Rule] 404(b) bars the use of evidence of other alleged wrongs to show, circumstantially, action in conformity therewith[,]" and so prohibited evidence that doctor "had a propensity to commit malpractice by misplacing pedicle screws and thus may or perhaps must have committed similar malpractice in [plaintiff's] surgery"). Since *Purcell* predates the adoption of the Arizona Rules of Evidence in 1977, one may reasonably question whether *Purcell* remains good law. *See State v. Schurz*, 176 Ariz. 46, 51 n.2 (1993) ("[O]nce Arizona adopted its Rules of Evidence, all prior evidentiary decisions in conflict with those rules were superseded."). But since no party asks us to revisit *Purcell*'s holding, that issue is not presented here.

expressly disclaimed any allegation of negligence), evidence of those surgeries was not admissible under the second prong of the *Purcell* test. *Purcell* does not, therefore, support the admission of evidence of any of the unsuccessful surgeries that Monash performed on twelve other patients.

¶63        In affirming the judgment, the Majority does not rely on *Purcell*, holding instead that evidence of the unsuccessful procedures that Monash performed on other patients was admissible under Rule 404(b) to prove "absence of mistake." *See supra* ¶ 25.

¶64        I disagree. Rule 404(b)'s "absence of mistake" exception applies only when a party seeks to rebut the opposing party's contention that he was unaware of a relevant fact or circumstance, or that he lacked the state of mind necessary to establish a claim or defense. *See, e.g., Lee v. Hodge*, 180 Ariz. 97 (1994). In *Lee*, the plaintiffs, after taking their car to a mechanic for repairs, later sued the mechanic for fraud and other claims, alleging that he damaged the engine by unnecessarily removing it from the car in order to increase the repair costs. The trial court precluded the plaintiffs from presenting evidence that the mechanic had defrauded other customers in similar ways. On appeal, the *Lee* court reversed, holding that the proffered evidence was admissible under Rule 404(b). Noting that "whether the damage to the engine in [the plaintiffs'] car was done intentionally, not accidentally[,]" was the "critical" issue, the *Lee* court held that evidence of the defendant's "intentional acts of damage to [other] customers' cars" was admissible to show that the damage to the plaintiffs' car was "not the result of a mistake[.]" 180 Ariz. at 101.

¶65        As *Lee* makes clear, the "absence of mistake" exception to Rule 404(b) applies when the parties dispute whether the act on which the claim of liability is based was done deliberately or in error. *Accord Stephenson v. Durrani*, 221 N.E.3d 1037, 1054 (Ohio App. 2023) ("[T]he absence of mistake exception only applies when a defending party claims that his wrong or crime was done mistakenly, which opens the door for the other side to provide evidence of previous wrongs or crimes to demonstrate that the defendant did *not* act mistakenly."). This exception often applies in criminal cases when the defendant admits committing the charged act but claims to have done so under a mistaken understanding of the relevant facts. Courts have held, for example, that if a criminal defendant charged with cocaine possession claims that he did not realize that the substance was cocaine, the prosecutor may properly rebut the defendant's claim of ignorance with evidence of his prior cocaine use. *See United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992) (holding that because "the defense theory at trial was that the defendants did not know what was in the package[,] . . . [e]vidence of [their] prior involvement with drugs" was admissible "to prove absence

of mistake or accident"). Similarly, if a defendant charged with burglary claims that he simply entered the wrong house by mistake, the prosecutor may properly rebut that contention with evidence that the defendant previously burglarized another house under similar circumstances. *See State v. Drew*, 891 A.2d 621, 625–27 (N.J. App. Div. 2006) (holding that because defendant claimed he entered the victim's home under the "mistaken" belief that his friend was inside, evidence of a prior, similar burglary was admissible "to show the absence of mistake").

¶66 The "absence of mistake" exception does not apply, however, when the parties' dispute involves no assertion of inadvertence or misunderstanding in performing the act on which the claim of liability is based. *See State v. Torres*, 162 Ariz. 70, 73 (App. 1989) (holding, in prosecution for heroin possession, that trial court erred in admitting evidence of defendant's prior heroin use because defendant's contention "that the heroin was not his" did not "bring[] into play any issue of motive, knowledge, intent, absence of mistake or accident"); *see also United States v. Brizuela*, 962 F.3d 784, 788, 798 (4th Cir. 2020) (holding, in prosecution of physician on 21 counts of unlawfully distributing controlled substances to "pill-seekers and addicts" who fatally overdosed, that trial court erred in admitting evidence of physician's uncharged conduct in improperly prescribing opioids to four other patients; evidence of uncharged conduct was not admissible to show "absence of mistake" because physician "never asserted he wrote any of the 21 prescriptions charged in the indictment due to a mistake").

¶67 Here, Monash's state of mind when he treated Marine was not a disputed issue. Because Monash never claimed that he was unaware of the nature of the treatment he provided to Marine, and Novalis-Marine never alleged that Monash deliberately harmed her husband, evidence that Monash previously performed unsuccessful procedures on other patients was not admissible to establish "absence of mistake" in his treatment of Marine. *See Malcolm v. Duckett*, 996 N.E.2d 988, 992 (Ohio App. 2013) ("[I]n the absence of a credible allegation that [surgeon] intentionally caused and failed to recognize a [bowel] perforation" when performing surgery on plaintiff, evidence of perforations in prior surgeries was not admissible to establish absence of mistake); *see also* Comment, "Help Me Doc! Theories of Admissibility of Other Act Evidence in Medical Malpractice Cases," 87 *Marq. L. Rev.* 981, 995 (2004) ("[P]roof of the absence of mistake or accident can be relevant in the context of a criminal case by helping to show that whatever occurred must have been the result of an intentional act. However, this logic does not function in a negligence action, where the intent of the actor to cause harm is not at issue." (footnote omitted)).

¶68        A review of the record makes it apparent, in my view, that evidence of the unsuccessful procedures that Monash performed on twelve other patients was offered for only one reason: to convince the jury that Monash was bad at his job. Proving a party's negligence by presenting evidence that he was negligent in his dealings with other people on other occasions is precisely what Rule 404(b) prohibits. *See Elia v. Pifer*, 194 Ariz. 74, 79 (App. 1998) (citing Rule 404(b) in reversing judgment for defendant in legal malpractice case based on improper admission of evidence of plaintiff's unrelated prior misconduct). "[O]ne cannot[,]" in other words, properly "present evidence the relevance of which is based on the forbidden inference" that "the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too." *United States v. Shirley*, 214 F.Supp.3d 1124, 1144–45 (D.N.M. 2016) (citation omitted); *see also Torres*, 162 Ariz. at 73 (reversing defendant's conviction for heroin possession based on improper admission of defendant's prior heroin use; "[T]he only relevance the evidence of prior drug use had . . . was the forbidden inference that because the defendant had used heroin in the past, he was using it now.").

¶69        Numerous courts have applied this principle in the medical malpractice context, holding that a plaintiff cannot properly establish a doctor's negligence by presenting evidence of the doctor's negligent treatment of other patients. *See, e.g., Rives v. Farris*, 506 P.3d 1064, 1070 (Nev. 2022) (citing Nevada's counterpart to Rule 404(b) in reversing judgment for plaintiff in medical malpractice case based on improper admission of evidence of defendant doctor's prior negligent treatment of another patient; "[T]he fact that [doctor] . . . acted inconsistently with the standard of care in a prior case does not make it more or less probable that he acted below the standard of care in *this* case."); *Hounchell v. Durrani*, 221 N.E.3d 1020, 1033 (Ohio App. 2023) (citing Ohio's counterpart to Rule 404(b) in reversing judgment for plaintiff in medical malpractice case based on improper admission of  evidence of prior malpractice lawsuits against defendant doctor; "The evidence . . . had little to no probative value on the question of [defendant's] malpractice with regard to [plaintiff]" and, instead, "ask[ed] the jury to infer that . . . because [doctor] had been charged with malpractice in the past, he must have committed malpractice against [plaintiff.]"); *Wlosinksi v. Cohn*, 713 N.W.2d 19, 21–22 (Mich. App. 2005) (citing Michigan's counterpart to Rule 404(b) in reversing judgment for plaintiff in medical malpractice case based on improper admission of evidence that defendant doctor performed "a string of failed [kidney] transplants" on other patients before performing decedent's; evidence "that [defendant] had a propensity to botch transplants" impermissibly suggested "that the defendant, who has made so many mistakes before, made one again."); *Lai

*v. Sagle*, 818 A.2d 237, 247–48 (Md. 2003) (citing Maryland's counterpart to Rule 404(b) in reversing judgment for plaintiff in medical malpractice based on her counsel's reference during trial to other malpractice suits against the same defendant doctor; "[S]imilar acts of prior malpractice litigation should be excluded to prevent a jury from concluding that a doctor has a propensity to commit medical malpractice."). Consistent with the result reached by these courts, I would hold that Rule 404(b) did not authorize the admission of evidence of the procedures that Monash performed on twelve other patients to prove his negligence in treating Marine.

¶70        Of course, a jury's verdict will not be disturbed based on erroneous evidentiary rulings absent a showing of prejudice. *Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, 88, ¶ 7 (App. 1998). The requisite prejudice will be found "if the reviewing court is unable to conclude that the jury would have reached the same verdict" but for the "[e]rror in admitting evidence[.]" *Groener v. Briehl*, 135 Ariz. 395, 398 (App. 1983) (citations omitted).

¶71        Here, prejudice from the improperly-admitted evidence is readily apparent. Evidence of the deaths of the defendant doctor's other patients is bound to weigh heavily on the jurors' minds in any medical malpractice case. *See Rives*, 506 P.3d at 1072–73 (reversing judgment in malpractice case after concluding that error in admitting evidence of doctor's prior act of medical negligence when treating another patient "was not harmless due to the evidence's tendency to encourage the jury to reach an improper propensity conclusion, as well as to cause unfair prejudice to [defendant] due to the severe injuries suffered by that patient."). Moreover, when other-act evidence is improperly admitted, the risk of unfair prejudice is exacerbated when the opposing party focuses the jury's attention on the improperly-admitted evidence. *See Devers v. La Mesa RV Center, Inc.*, 1 CA-CV 24-0499, 2025 WL 1711425 at *11, ¶ 53 (Ariz. App. June 19, 2025) (mem. decision) (vacating judgment in favor of defendant based on improper admission of evidence impeaching plaintiff's character for truthfulness in part because defendant "made [plaintiff's] purported untruthfulness the linchpin of its defense"); *see also Rives*, 506 P.3d at 1070 (holding that improper admission of evidence of defendant doctor's negligent treatment of another patient  was "not harmless" in part because evidence was mentioned frequently at trial).

¶72        Here, the deaths of eleven other patients of Monash's, as well as J.W.'s botched appendectomy, were the central focus of Novalis-Marine's case. In opening statement, Novalis-Marine's counsel told the jury that his client "brought this lawsuit" to hold Monash accountable not only for her husband's death, but also for "Dr. Monash's actions with respect to

those other patients[.]" According to counsel, Monash "has not only denied any responsibility" for Marine's death, "[h]e's denied any responsibility for any of these deaths except for one where there was a lawsuit[.]" Referring to the eleven patient deaths as "the body count," counsel told the jury that "the cycle" of "[d]eath, death, death" is "what this case comes down to." Counsel's parting words to the jury were, "We need you to end the cycle."

¶73        Because the improperly-admitted evidence of unsuccessful procedures Monash performed on other patients was central to the plaintiff's case, I don't see how one could possibly conclude that the evidence had no effect on the jury's decision. I would vacate the judgment and remand for a new trial, untainted by evidence of Monash's unsuccessful treatment of other patients.



MATTHEW J. MARTIN • Clerk of the Court
FILED:            JR